

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-2000

# Applebaum v. Nissan Motor

Precedential or Non-Precedential:

Docket 99-1373

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Applebaum v. Nissan Motor" (2000). *2000 Decisions.* Paper 184.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/184

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 30, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1373

LEONARD APPLEBAUM,

      Appellant

v.

NISSAN MOTOR ACCEPTANCE CORPORATION;
REITENBAUGH ENTERPRISES, INC.

ON APPEAL FROM THE ORDER OF THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Dist. Court No. 97-cv-07256
District Court Judge: The Honorable Norma L. Shapiro

Argued Tuesday, January 11, 2000

Before: BECKER, Chief Judge, and ALITO and BARRY,
Circuit Judges

(Opinion Filed: August 30, 2000)

        Cary L. Flitter (Argued)
        LUNDY, FLITTER, BELDECOS &
         BERGER, P.C.
        450 N. Narberth Avenue
        Narberth, PA 19072
         Attorney for Appellant

          Jill E. Jachera (Argued)
          Christine M. Kovan
          MORGAN, LEWIS & BOCKIUS, LLP
          1701 Market Street
          Philadelphia, PA 19103
           Attorney for Appellee
          Nissan Motor Acceptance
          Corporation

          Gerard Bruderle
          Timothy A. Kulp (Argued)
          MARGOLIS EDELSTEIN
          The Curtis Center, 4th Floor
          Independence Square West
          Philadelphia, PA 19106
           Attorney for Appellee
          Reitenbaugh Enterprises, Inc.

OPINION OF THE COURT

ALITO, Circuit Judge:

Leonard Applebaum leased two automobiles from Nissan Motor Acceptance Corporation ("NMAC") through a dealership owned and operated by Reitenbaugh Enterprises ("Reitenbaugh"). Applebaum sued NMAC and Reitenbaugh, contending that the early termination provisions in his leases violated the disclosure requirements of the Consumer Leasing Act ("CLA") and Regulation M, which implements the Act. The District Court entered summary judgment in favor of the defendants, and Applebaum took this appeal. We hold that the early termination provisions in the NMAC leases do not comply with the requirements of the CLA; we therefore reverse.

I.

On November 2, 1994, Applebaum signed a 36-month closed-end lease1 for a 1995 Nissan Maxima. The lease was

_____

1. A "closed-end" lease is "[a] lease in which [the lessee is] not responsible for the difference if the actual value of the vehicle at the

2

between Applebaum and Reitenbaugh, but Reitenbaugh promptly assigned the lease to NMAC. Applebaum terminated his 1994 lease approximately 10 months before the end of the 36-month term in order to trade in his 1995 Maxima for a 1997 model. As is common with automobile leases, NMAC's standard closed-end motor vehicle lease agreement imposed a penalty for early termination. The lease provided:

> First, all monthly lease payments, which under the terms of my lease, are not yet due and the residual value of the vehicle are discounted to present value by the Constant Yield Method at the rate implicit in the lease (the "Adjusted Lease Balance"). This amount is then reduced by the Realized Value (and insurance) proceeds which you receive for the vehicle. The balance due you is the Early Termination Charge which I will pay to you immediately. If there is an excess, however, you will not refund it to me.

1994 Lease, App. at R3; 1997 Lease, App. at R4-5. In the course of negotiating the 1997 lease, Reitenbaugh quoted Applebaum a pay-off figure of $18,111. Reitenbaugh explained that after a trade-in allowance of $12,500 ("the Realized Value") he owed NMAC $5,611 as an early termination charge.[2]

According to Applebaum, he was aware that there would be an early termination penalty but was surprised that it was so large. When he asked Reitenbaugh to explain how it had arrived at the pay-off figure, the dealer responded that it had not performed the calculation and had no idea how the figure had been derived. Reitenbaugh's practice was to call NMAC for the pay-off figure, and the dealer suggested that Applebaum call NMAC and ask how the figure was

_____

scheduled end of the lease is less than the residual value," but the lessee "may be responsible for excess wear and excess mileage charges and for other lease requirements." Federal Reserve Board Leasing Language (last updated March 29, 2000). <http://www.federalreserve.gov/pubs/leasing/glossary htm>.

2. The record shows that the residual value of Applebaum's 1995 Nissan was $15,018.30 and that the rate implicit in the lease was 8.910068. See App. at R-55.

calculated. Heeding Reitenbaugh's advice, Applebaum telephoned NMAC in early January 1997. Applebaum contends that his conversation with NMAC was equally unhelpful. Without a satisfactory explanation of how NMAC had calculated the early termination charge, Applebaum nonetheless entered into the 1997 lease. The $5,611 charge was capitalized into the lease payments under the 1997 lease.

Applebaum continued to seek an explanation of his early termination liability. Having failed to make headway on his own, Applebaum retained counsel. By letter to NMAC in July 1997, Applebaum's counsel requested a written explanation of how NMAC had arrived at the $18,111 pay-off figure. In reply, NMAC's legal department stated that it could not reconstruct the pay-off calculation because the computer system that performs the calculation does not retain pay-off information once an account has been terminated. Applebaum's counsel pressed for an identification of the residual value of the vehicle and how that value had been discounted to present value at the rate implicit in the lease using the constant yield method. See App. at R-9. NMAC responded that the rate was proprietary and that its prior disclosures were adequate to satisfy Regulation M. See App. at R-10.

Applebaum then sued NMAC and Reitenbaugh, alleging a violation of the Consumer Leasing Act, 15 U.S.C.SS 1667-1667e. Applebaum contended that the early termination provision of the leases violated the CLA because the formula for computing the early termination charge was indecipherable and because the provision did not define some of the terms it used. The District Court granted summary judgment for the defendants, holding that the CLA and Regulation M require an early termination clause to be "visible to the lessee and in a readable format" but that the clause "need not be simple enough to do the mathematical calculation of the exact amount." Dist. Ct. Op. at 8. The Court concluded that the lease provisions at issue here were not required to explain the constant yield method, a term that was "well known in the industry." Id. at 12. Likewise, the Court held that the lease provisions were not required to disclose the vehicles' residual value.

4

This term, the court commented, "is not void of meaning to the average consumer; it means whatever value remains in the vehicle when the lease terminates." Id . at 15. "The CLA and Regulation M," the Court added, "do not require further definition." Id. Applebaum then took this appeal.

II.

In 1976, in response to an emerging trend toward automobile leasing, Congress passed the Consumer Leasing Act ("CLA"), 15 U.S.C. S 1667-1667e as Chapter 5 of the Truth in Lending Act ("TILA"), 15 U.S.C. S 1607 et seq. The CLA was intended "to assure a meaningful disclosure of the terms of leases of personal property for personal, family, or household purposes so as to enable the lessee to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements." 15 U.S.C. S 1601(b). The Senate Report accompanying the CLA stated that "[t]he purpose of the legislation is to provide consumers with meaningful information about the component and aggregate costs of consumer leases, so that they can make better informed choices between leases, and between leases and credit sales." See S. Rep. No. 94-590 (1976), reprinted in 1976 U.S.C.C.A.N. 431, 432.

The Federal Reserve Board has been given the authority to issue rules implementing the CLA, see 15 U.S.C. S 1604, and the Board has exercised that authority by promulgating "Regulation M," 12 C.F.R. S 213 et seq. (In this case, we consider the version of Regulation M in effect prior to the 1996 amendment now in force.)[3] The Board's staff has also issued official commentary regarding these provisions. In Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 568 (1980), the Supreme Court instructed that the

_____

3. In 1996, the Federal Reserve Board revised Regulation M and issued new commentary. Although these revisions became effective on October 31, 1996, compliance was optional until October 1, 1997. Applebaum does not contend that these new provisions apply in this case.

Board's interpretation of the TILA and Regulation M should be accepted so long as they are "not irrational."[4]

The CLA provides in pertinent part as follows:

> Each lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:
>
> *  *  *
>
> (11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination.

15 U.S.C. S 1667a(11) (emphasis added).

The version of Regulation M in effect at the time in question required that lessors' disclosures "be made clearly, conspicuously, in meaningful sequence, and in accordance with the further requirements of this section." 12 C.F.R. S 213.4(a)(1) (1995). The Official Staff Commentary for this provision explained that "clearly, conspicuously, and in meaningful sequence" required "that disclosures be in a reasonably understandable form." 12 C.F.R. Pt. 213, P 4(a)(1). This Commentary added that "while the regulation requires no particular mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other." Id.

With respect to provisions imposing an early termination penalty, Regulation M mandated that the lessor provide:

_____

4. Ford Motor Credit Co. was decided before Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), but we interpret Ford Motor Credit Co. to mean that the Board's interpretation of the TILA is governed by Chevron and that its interpretation of its own regulations is governed by Bowles v. Seminole Rock Co., 325 U.S. 410, 413–14 (1945).

6

> A statement of the conditions under which the lessee
> or lessor may terminate the lease prior to the end of
> the lease term and the amount or method for
> determining the amount of any penalty or other charge
> for early termination.

12 C.F.R. S 213.4(g)(12) (1995) (emphasis added).5

III.

A.

Applebaum argues that P 17 of the 1994 Lease and P 18 of the 1997 Lease (collectively "the Leases") violate the CLA and Regulation M because their disclosures regarding the early termination charges are not set out "in a clear and conspicuous manner." Applebaum contends that the early termination provision is "so indecipherable that virtually no reader could comprehend it." Appellant's Br. at 21. Applebaum suggests that the Second Circuit's per curiam opinion in Lundquist v. Security Pacific Automotive Financial Services, 993 F.2d 11 (2d Cir. 1993), properly interpreted the meaning of the CLA's "clear and conspicuous manner" requirement. In Lundquist, the Court held that the early termination disclosures of an automobile lease agreement violated the CLA because they were "confusing, unduly complicated, and unnecessarily convoluted" and "beyond the understanding of the average consumer." Lundquist, 993 F.2d at 15.

_____

5. We note that provisions of Regulation M that were added in 1996 and that are now in effect address the chief issues that are presented in this case. The new Staff Commentary specifically states that a lease need only name the method of discounting to present value that it uses and need not explain how that method works. See 12 C.F.R. Pt. 213, P 4(g) (2000).

In revising Regulation M, the Board specifically considered whether to require disclosure of the rate implicit in the lease but ultimately decided not to do so. See FRB Final Rule, 61 FR 52246, 52254-56 (Oct. 7, 1996). However, the revised version of Regulation M requires disclosure of residual value in both open- and closed-end leases. See 12 C.F.R. S 213.4(f)(4) (2000).

Lundquist was sharply criticized by the Seventh Circuit in
Channell v. Citicorp Nat'l Servs., Inc., 89 F.3d 379, 383 (7th
Cir. 1996). The Seventh Circuit confronted a challenge to a
lessor's method of determining unearned interest in an
early termination clause. The lessee asserted that a
reference in the lease to the "Sum of the Digits" method
was "incomprehensible to the average consumer and
therefore violated the requirement that disclosures be clear
and conspicuous." Id. at 381. Noting that 12 C.F.R.
S 213.4(g)(12) could be satisfied by disclosing the "method
of determining the amount of any penalty or other charge
for early termination," the Court concluded that"only the
method, and not the way the method works, needs to be
disclosed." Id. at 382. The Court stated:

> It is hard to read the statute and regulation any other
> way. "Clear and conspicuous manner"--the language of
> S 1667a -- means visible, not simple. "Manner" refers
> to the mode of presentation, not the degree of
> comprehension. The Act and Regulation M do not
> define "clear and conspicuous," but the words are
> staples of commercial law. The Uniform Commercial
> Code defines "conspicuous" as "so written that a
> reasonable person against whom it is to operate ought
> to have noticed it." UCC S 1-201(10). A disclaimer of
> the warranty of merchantability is enforceable if
> conspicuous, see UCC S 2-316(2), even if the average
> consumer hasn't the vaguest idea what a "warranty of
> merchantability" entails. Regulation M calls for the use
> of 10-point type at a minimum. S12 C.F.R. 213.4(a)(1).

Id.

Turning to Lundquist, the Court observed:

> We confess to substantial difficulty deciphering the
> opinion in Lundquist. . . . The court does not explain
> why the operation of a formula must be simple--for the
> Act requires a clear presentation but does not limit the
> number of variables the lessor may consider. The
> quoted words "confusing, unduly complicated, and
> unnecessarily convoluted" lack a source-- they are not
> quoted from anything, and a search of a database
> containing all federal opinions of the last 50 years did

8

> not turn up any other uses of that phrase. It does not
> appear anywhere in the United States Code or the Code
> of Federal Regulations.

Id. at 383.

B.

Under 15 U.S.C. S 1667a(11), the leases at issue in this
case were required to disclose either the "amount or
method for determining" the early termination charge. Since
the amount was not disclosed, the critical question is
whether the "method" was revealed in the way that the law
demands. Under 15 U.S.C. S 1667a, this disclosure had to
be effected "in a clear and conspicuous manner."

The term "conspicuous" is unambiguous. In ordinary
usage, it means "obvious to the eye" or "plainly visible."
Webster's Third New International Dictionary 485 (1971).
See also Channell, 89 F.3d at 381 (citing similar definition
in UCC S 1-201(10)). Here, Applebaum does not contend
that the disclosures in the early termination provision were
not "conspicuous."

The term "clear," on the other hand, may be interpreted
in several different ways. Among other things, it may mean:
(1) "easily visible or distinguishable," (2)"without
misconception, error, or vagueness," or (3) "easily
understood." Webster's Third New International Dictionary
419. In S 1667a, the term "clear" might refer to the physical
characteristics of the printing used in the lease, or it might
refer to the characteristics of the language used in making
the required disclosures. If the Channell opinion suggests
that the first meaning is the only possible one, see 89 F.3d
at 382 (" `Clear and conspicuous'--the language of S 1667a
--means visible . . . ."), we respectfully disagree. Because
the statutory language is ambiguous, it is appropriate to
consider the Federal Reserve Board's interpretation of this
provision.

The Board's Official Staff Commentary adopts an
interpretation that refers to the characteristics of the
language used in making the disclosures. This Commentary
states that disclosures must be made "in a reasonably

9

understandable form." 12 C.F.R. Pt. 213, P 4(a)(1) (1995).
"Understandable" means more than "legible"; many things
are legible but not understandable. It is therefore apparent
that the Official Staff Commentary interprets the term
"clearly" to refer to meaning, not just appearance. We defer
to this interpretation. We thus hold that disclosure of the
method of calculating an early termination penalty must
not only be legible; it must also be "reasonably
understandable."

To say that the language used in a disclosure must be
cast in "reasonably understandable form," however, is not
to say that the meaning of this language must be within
"the understanding of the average consumer," as the
Second Circuit has suggested. Lundquist, 993 F.2d at 15.
Here, as in other areas of the law, what is reasonable
depends on the surrounding circumstances. Thus, the CLA
and Regulation M require disclosure in a form that is
"reasonably understandable" in light of the inherent
difficulty or complexity of the method described; they do
not necessarily demand disclosure in a form that the
average consumer can understand. We recognize that some
methods used in calculating early termination penalties
involve math that is well beyond the understanding of the
average consumer. If 15 U.S.C. S 1667a and 12 C.F.R.
S 213.4 (1995) meant that any method of determining an
early termination penalty had to be capable of explanation
in a way that the average consumer could understand,
these provisions would in effect impose substantive
restrictions on the methods that a lessor could employ. It is
plain, however, that these provisions were not intended to
impose any such substantive restrictions.6

C.

With these standards in mind, we turn to the leases at
issue here. As previously noted, they provide in pertinent
part as follows:
_____

6. To clarify, we mean that disclosure must be cast in a form that is
reasonably understandable in light of the difficulty of the matter being
disclosed. The benchmark is the nature of the matter discussed.

10

First, all monthly lease payments, which under the terms of my lease, are not yet due and the residual value of the vehicle are discounted to present value by the Constant Yield Method at the rate implicit in the lease (the "Adjusted Lease Balance"). This amount is then reduced by the Realized Value (and insurance) proceeds which you receive for the vehicle. The balance due you is the Early Termination Charge.

App. at R3, R4-5.

This language plainly satisfies one of the requirements set out in the Federal Reserve Board Staff Commentary, viz., this language "does not obscure the relationship of the terms to each other." 12 C.F.R. Pt. 213, P 4(a)(1) (1995). On the contrary, the relationship of the terms is easy to grasp:

Early Termination Charge = Adjusted Lease Balance – Realized Value.

Adjusted Lease Balance = (Residual Value + unpaid present value) discounted to present value at the Rate Implicit in the Lease using the Constant Yield Method.

If the terms "constant yield method," "rate implicit in the lease," and "residual value," were "reasonably understandable," the method used in calculating the early termination penalty would be as well. We therefore consider those specific terms.

IV.

Applebaum contends that the terms "constant yield method," "rate implicit in the lease," and "residual value" should have been explained in the leases. The version of Regulation M in effect at the time in question required leases covered by the CLA to disclose numerous categories of specific information, see 12 C.F.R.S 213.4(g)(1)-(15) (1995), but Regulation M did not specifically require a definition or description of any of these terms.

Constant Yield Method

The "constant yield method" is a technical term with a specified meaning. A Federal Reserve Board webpage that

11

explains terms related to vehicle leasing defines the constant yield method as follows:

> The method of earning rent charges in which the rent charge earned each month is proportional to the remaining lease balance. Under this method, the lessor or assignee earns rent charges at an equal rate over the term, similar to most home first mortgages.

Federal Reserve Board, Leasing Language (last updated March 29, 2000) <http://www.federalreserve.gov/pubs/leasing/glossary.htm>. Use of this method, however, is not easy. See, e.g., 26 C.F.R. S 1.1272-1 (b) (setting out steps for using constant yield method for certain tax purposes). In all likelihood, the vast majority of lay persons could not discount to present value using the constant yield method even if a description were provided."A beneficial set of disclosure rules gives the consumer information that can be put to use, while withholding technical information that distracts attention from the rest of the disclosures." Channel, 89 F.3d at 382.

Under these circumstances, we hold that simply disclosing that the "constant yield method" was used, without attempting to explain how to use this method, satisfied the "reasonably understandable" requirement. Although the Official Staff Commentary to the current version of Regulation M does not change the law retroactively, we are persuaded by the staff 's determination that simply naming an established method of discounting to present value, without attempting to explain the method in the lease itself, is sufficient to make a lease reasonably understandable for present purposes. This commentary states:

> [F]or purposes of the early termination charge a lessor may use the name of a generally accepted method of computing the unamortized cost portion (also known as the "adjusted lease balance") of its early termination charges. For example, a lessor may state that the "constant yield" method will be utilized in obtaining the adjusted lease balance

12 C.F.R. Part 213, P 4(g) (2000).

12

Rate Implicit in the Lease

Every discounting method must employ some discount rate, but early termination provisions rarely set forth such a rate. The presumption in these leases, apparently, is that whatever the named discounting method, it will be carried out at the rate implicit in the lease. We view the leases' reference to the rate implicit in the lease as surplusage, since NMAC would have been required to discount at the rate implicit in the lease even in the absence of such a reference. We also note that the Board has declined to impose an obligation that lessors disclose the lease rate after giving the question considerable thought and attention. See FRB Final Rule, 61 FR 52246, 52254-55.

Residual Value

Although the NMAC leases use the concept of "residual value" in calculating the early termination penalty, the leases do not define that term or specify the vehicles' residual value. What is more, neither Reitenbaugh nor NMAC provided this information to Applebaum or his attorney, despite their requests.[7]

"Residual value," like the constant yield method, is a term with an established meaning in the leasingfield. The Federal Reserve Board's webpage defines the term as follows: "The end-of-term value of the vehicle established at the beginning of the lease and used in calculating your base monthly payment . . . ." Federal Reserve Board, Leasing Language (last updated March 29, 2000) <http://www.federalreserve.gov/pubs/leasing/glossary.htm>. Similarly, the term is now defined by 12 C.F.R. S 213.2(n) (2000) as "the value of the leased property at the end of the lease term, as estimated or assigned at consummation by the lessor, used in calculating the base periodic payment." Moreover, it is apparent that this is precisely the sense in which the term is used in the NMAC

_____

7. We note that even had Reitenbaugh or NMAC provided Applebaum with the residual value upon his request, it would not have cured their disclosure violation. The duty to disclose under the CLA is breached, if at all, at the time of lease consummation. 15 U.S.C.S 1667a.

13

leases. Thus, "residual value" is not "whatever remains in vehicle when the lease terminates", Dist. Ct. Op. at 15; rather, "residual value" is a figure assigned by the lessor at the beginning of the lease.

In order to discharge their disclosure obligations, the defendants in this case were required to reveal the residual value that had been assigned to Applebaum's cars. NMAC knew these figures, and it could have easily disclosed them. Its failure to do so meant that no one--not even a person capable of determining the rate implicit in the leases and capable of discounting to present value using the constant yield method--could have calculated an early termination penalty under the formula set out in the leases. An early termination clause that fails to reveal an otherwise unknowable variable used in determining an early termination penalty[8] cannot be regarded as "reasonably understandable" in any meaningful sense of the term.

NMAC's chief argument, which the District Court accepted, is that the Federal Reserve Board, in promulgating the version of Regulation M in effect at the time in question, implicitly determined that closed-end leases, like those involved in this case, did not have to reveal the vehicles' residual value. NMAC notes that the version of 12 C.F.R. S 213.4(g)(15) in effect at the time required an open-end lease to disclose the vehicle's residual

_____

8. This is distinguishable from information that is unknown to the lessor at the time of lease signing, for which the lessor is permitted to provide a reasonable estimate. See 15 U.S.C. S 1667a ("The Board may provide by regulation that any portion of the information required to be disclosed under this section may be given in the form of estimates where the lessor is not in a position to know exact information."); 12 C.F.R. Pt. 213, P 4(d) (1995) ("The lessor may use estimates to make disclosures if necessary information is unknown or unavailable at the time the disclosures are made. . . . Estimates must be made on the basis of the best information reasonably available at the time disclosures are made."). For example, in Applebaum's leases, the early termination charge was a function of the Realized Value of the automobile -- viz., the value of the vehicle at the time of lease termination. Because the parties to the lease could not predict when the lease would terminate at the time they entered into the lease, it was sufficient to provide the method for determining Realized Value at lease end. See App. at 3.

14

value but that no such requirement was imposed with respect to closed-end leases. Warning against upsetting the FRB's regulatory scheme by imposing a disclosure obligation that the FRB declined to impose, NMAC urges that we not read the absence of a disclosure requirement as

> the result of a lack of prescience; it may instead betoken permission, or perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.

Ford Motor Credit Co., 444 U.S. at 565.

We reject this argument because it overlooks a critical difference between open- and closed-end leases. An open-end lease is one in which the lessee's liability at the end of the lease term is based on the difference between the residual value of the leased property and its realized value.[9] Consequently, residual value is always relevant to a lessee's liability in an open-end lease, and the Board thus had a strong reason to require the disclosure of this value. By contrast, lessors need not, and often do not, use the concept of residual value in closed-end leases, and therefore, the Board's failure specifically to require the disclosure of residual value in closed-end leases cannot reasonably be interpreted as a considered decision that disclosure is not necessary to make a closed-end lease reasonably understandable if it uses that term. Here, NMAC constructed its early termination provision in such a manner as to make residual value an essential component of the calculation. Since the leases took this approach, defendants were obligated to disclose this value. They did not do so.

In sum, we hold that the requirement to disclose in a "clear and conspicuous manner" the method of determining the amount of an early termination charge includes an

---

9. See 12 C.F.R. S 213.2(j) (2000). We cite this subsequently promulgated provision to show the commonly understood meaning of this term, not because we regard it as legally binding in this case.

15

obligation to disclose the value of a variable, such as residual value, that is an essential component of the formula used in calculating the charge. Accordingly, we reverse and remand for the entry of judgment in favor of Applebaum and for the award of appropriate relief.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16