

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-22-2004

# Miller v. Nissan Mtr

Precedential or Non-Precedential: Precedential

Docket No. 02-2432

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Miller v. Nissan Mtr" (2004). *2004 Decisions.* Paper 884.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/884

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos:  02-2432 & 02-2573

BRIAN S. MILLER; MICHAEL ROSE;
MICHELLE ROSE, H/W, ON BEHALF
OF THEMSELVES AND ALL
OTHERS
SIMILARLY SITUATED

v.

NISSAN MOTOR ACCEPTANCE
CORP.

Nissan Motor Acceptance Corporation
("NMAC"),

Appellant in No. 02-2432

Brian S. Miller; Michael Rose; and
Michelle Rose,

Appellants in No. 02-2573

Appeal from the United States District
Court
for the Eastern District of Pennsylvania
(Civ. No. 99-cv-04953)
District Judge: Hon. Stewart Dalzell

Argued: February 11, 2003

(Opinion filed:  March 22, 2004)

Before: ALITO and McKEE, Circuit
Judges, and

SCHWARZER, District Judge[*]

DARRYL J. MAY, ESQ.  (Argued)
RAYMOND A. QUAGLIA, ESQ.
AMY B.  CARVER, ESQ.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Attorneys for Appellant/Cross-Appellee,
NMAC

CARY L. FLITTER, ESQ.  (Argued)
Lundy, Flitter, Beldecos & Berger, P.C.
450 N. Narberth Avenue
Narberth, PA 19072

MICHAEL D. DONOVAN, ESQ.
Donovan Searles, LLC
1845 Walnut Street
Philadelphia, PA 19103

Kirby, McInerney & Squire, LLP
830 Third Avenue

[*]The Hon. William W. Schwarzer,
United States District Judge for the
Northern District of California, sitting by
designation.

New York, NY 10022
Attorneys for Appellees/Cross-
Appellants,
Miller and Rose

---

OPINION

---

McKEE, Circuit Judge.

In these cross-appeals, we are presented with a number of questions concerning certain requirements of the Consumer Leasing Act ("CLA"), 15 U.S.C. §§ 1667-1667e, as they apply to automobile leases. As we will explain in some detail, when the plaintiffs/lessees terminated their leases prior to the expiration of the terms of their respective leases, the lessor required that they pay the balance of the remaining monthly payments due under their leases rather than charge them the early termination fee in accordance with a formula contained in their leases. The lessees paid that charge and then instituted suit claiming that the method for determining the early termination charges they actually paid violated the disclosure requirements of the CLA § 1667a. The lessees also claimed that the early termination charge they actually paid violated the substantive reasonableness requirements of CLA § 1667b(b), and that the method for calculating the early termination charge contained in their leases violated the substantive requirements of the CLA as

well as its disclosure requirement.[1]

The district court agreed with the lessees' disclosure claims. It also agreed that the method for calculating an early termination charge that was contained in the leases violated the CLA reasonableness requirement. However, it disagreed that the early termination charge actually paid violated the CLA's reasonableness requirement.

We agree that the leases violated the CLA's disclosure requirements because the method for determining the early termination charges actually assessed was not contained in the respective leases. We also agree that the method for determining the early termination charges actually assessed did not violate the CLA's reasonableness requirement. However, since we conclude that the lessees had no standing to challenge the early termination charge that was never applied to them, we will not address lessees' challenge to that formula.

## I. BACKGROUND

Brian Miller executed a 36-month closed-end lease with Nissan Motor Acceptance Corporation ("NMAC") for a 1997 Nissan Altima on December 26, 1996. Pursuant to that lease he agreed to

---

[1]The lessees also asserted a number of state law claims against the lessor. However, as will be explained, those claims are not before us because the district court entered judgment under Fed.R.Civ.P. 54(b) as to the CLA claims and suspended adjudication of the state law claims.

2

make monthly payments of $267 through December 1999. Michael and Michelle Rose executed a 39-month closed-end lease with NMAC for a 1996 Nissan Altima GXE on March 25, 1996. They agreed to make monthly payments of $237.87 through June 1999.[2]

Both leases contain a "Paragraph 18," captioned: "Early Termination Liability," which provides in relevant part:

> At any time after 12 monthly payments have been paid, I [the lessee] may terminate this lease on the due date of a monthly lease payment if this lease is not in default as disclosed in paragraph 19 ["Default"],

and I have given you [NMAC] 30 days written notice. Except as otherwise provided in paragraph 22 [concerning NMAC's acceptance of insurance settlement if the vehicle is lost through theft or destruction], if I terminate early, in addition to the amounts indicated in items a through d of paragraph 17 ["Termination Liability"], I must pay you an Early Termination Charge which is determined as follows: First, all monthly lease payments, which under the terms of this lease, are not yet due and the residual value of the Vehicle are discounted to present value by the Constant Yield Method at the rate implicit in this lease (the "Adjusted Lease Balance"). This amount is then reduced by the Realized Value (and insurance) proceeds which you receive for the Vehicle.
> . . .

NMAC refers to the formula in Paragraph 18 as either the "paragraph 18 formula," or the "early termination formula."

Miller and the Roses claim that they made inquiries and took actions with respect to early termination of their respective leases. Miller claimed that he telephoned NMAC in March 1999 to

---

[2] "A closed-end lease is a lease in which the lessee is not responsible for the difference if the actual value of the vehicle at the scheduled end of the lease is less than the residual value, but the lessee may be responsible for excess wear and excess mileage charges and for other lease requirements." *Applebaum v. Nissan Motor Acceptance Corporation*, 226 F.3d 214, 216 n.1 (3d Cir. 2000) (citation and internal bracket and quotations omitted). In contrast, an open-end lease "is one in which the lessee's liability at the end of the lease term is based on the difference between the residual value and its realized value." *Id*. at 223. The residual value of a vehicle is the projected value of the vehicle at the end of the lease that is assigned at the beginning of the lease. *Id.* at 222 (citation omitted).

3

request the amount he would owe if he terminated his lease early.[3] Miller said that a NMAC representative gave him a figure so high that he gave no consideration whatever to early termination. However, on March 4, 1999, NMAC mailed Miller a letter which contained a quote that was considerably lower than the phone quote. The letter stated that paying all of the remaining payments that would have been due under the lease – $3,064.81, including taxes and disposition fees – would be a less expensive option for Miller.

Dissuaded in part by what he considered two pricey early termination quotes, Miller said that he decided not to terminate his lease until November 1999. At that time, Miller terminated his lease in the process of trading-in the leased vehicle for a new lease on another Nissan vehicle. However, NMAC did not apply the Paragraph 18 formula to that trade-in. Instead, NMAC charged Miller only his final month's lease payment, which was less than the charge derived under

Paragraph 18 would have been. Miller paid this lesser charge.

The Roses terminated their lease on March 23, 1999, less than three months before its scheduled expiration, by turning over their leased Nissan vehicle to a Mitsubishi dealership as part of a trade-in for a Mitsubishi vehicle. NMAC did not apply the Paragraph 18 formula to the Roses either. Rather, it only charged the sum of their two remaining monthly payments, which was less than the amount they would have owed under the Paragraph 18 formula. The Roses paid this charge "under protest." It is agreed that the method of paying early termination liability by paying only the amount of the remaining monthly payments is not contained in either lease agreement.

Miller and the Roses ("the Plaintiffs") claim that NMAC uses inflated residual values for its leased vehicles. They contend that if NMAC had used *bona fide* residual values and charged them for early termination pursuant to the Paragraph 18 formula, they would have been charged less than they were actually charged, or nothing at all, for early termination. Their theory about the inflated residual values is as follows:

They submit that the early termination charges under the Paragraph 18 formula are astonishingly high in part because of NMAC's undisclosed practice of using inflated or "subvented" residual values in calculating lease payments.[4,5]

---

[3]NMAC claims that Miller's call was "a lawyer-staged phone call rather that a *bona fide* early termination request." NMAC's Reply Br. and Answering Br. as Cross-Appellee, at 1. NMAC further claims that Miller never had any intention of terminating his lease in March of 1999 and that Miller made the phone call to NMAC from his lawyer's office for litigation purposes only. See NMAC's Reply Br. at 13. According to NMAC, this whole lawsuit is a fabrication.

---

[4]A "subvented" residual value is one which is raised in order to lower a

4

They claim that the relationship between the residual value and the lease payments is simple. The total payments over the life of the lease are determined by lease depreciation and lease charges. The lease charges are analogous to interest payments. The lease depreciation pays for the depreciation of the leased vehicle over the life of the lease and reflects that the car will be worth less at the end of the lease than it was at the beginning. The less depreciation NMAC assumes the car will undergo during the life of the lease, the smaller the lease depreciation component of the monthly lease payments will be. In order to reduce lease payments and price Nissan vehicles more competitively with other manufacturers' cars, NMAC can, and does, use an

customer's monthly payments under a lease. NMAC's Br. as Appellant, at 29 n.12. "A higher residual value results in less scheduled depreciation over the term of the lease, and hence lower monthly payments." *Id*.

[5]NMAC claims that, contrary to the Plaintiffs' characterizations, subvention (or inflating residual values) is not a uniform practice. NMAC says that the record clearly shows that there were extraordinary variations in subvention depending on, *inter alia*, the model car, the lease term and date of the lease. NMAC's Reply Br. at 22 n.4. These claimed variations are not significant here because NMAC concedes that the residual values under the Plaintiffs' leases were subvented.

artificially high residual value. This results in an artificially low estimate of the amount of depreciation the car will experience during the term of the lease. Put another way, NMAC assumes, for purposes of computing lease payments, that the car will be worth more at the end of the lease (because it experienced less depreciation) than it actually expects will be the case.

However, Plaintiffs claim that NMAC does not disclose that it inflates the residual values used to compute lease payments. They also claim that NMAC does not disclose the actual residual values NMAC has assigned to the lessee's car. Therefore, according to the Plaintiffs, lessees can not ascertain if the assumed residual value is inflated.

Plaintiffs concede, however, that since NMAC is responsible for the difference between the residual and realized values (a "closed lease"), the inflated residual values make no practical or economic difference to lessees whose leases go to maturity.[6] However, they say that a problem arises with inflated residual values when a lessee seeks to terminate the lease early. Under the Paragraph 18

[6]In fact, the inflated residual values the Plaintiffs complain of can dramatically advantage the lessee who holds his/her vehicle for the full term of the lease because monthly payments during the course of the lease will be less than they would have been had the lessor based monthly payments on a more realistic residual value.

5

formula, the early termination charge is based, in part, on the difference between the assigned, though undisclosed, residual value and the realized value upon the sale of the vehicle. Miller and the Roses allege that under the Paragraph 18 formula NMAC shifts to the early terminating lessee the risk, otherwise borne by NMAC, that the vehicle will turn out to be worth less than the residual value that was used to compute the lease payments.

According to Plaintiffs, where the residual value is inflated, NMAC's contractual early termination formula causes an early terminating lessee to pay more upon returning the car than if the lessee had made all of the payments for the full term of the lease. In Miller's case, the early termination charge under the Paragraph 18 formula as of November 1999 (one month early) was $5,336.95. Miller claimed that when added to the 35 monthly payments of $267 each that he had already paid ($9,345), NMAC's Paragraph 18 formula called for him to pay a total of $14,681.95. Full performance under the lease, in contrast, required Miller to pay only $9,612. Accordingly, under the Paragraph 18 formula, Miller was required to pay $5,069.95 to return his car one month early.

In the Roses' case, the Paragraph 18 formula called for them to pay $2,282.28 as a charge to terminate the lease early. When this charge is added to the monthly payments they had already made, totaling $8,796 ($237.87 x 37), the Roses would have been required to pay a total of about $11,078. Just two months later at the natural end of their lease, their total payments through maturity would have been only $9,276.93. Pursuant to the Paragraph 18 formula, surrounding the car two months early would have required the Roses to pay NMAC $1,801.07 more than keeping it to the end of the term.

Plaintiffs claim that even though NMAC's early termination formula recoups for NMAC the difference between the residual value and the realized value of the car, NMAC's controller admitted that the cause of Nissan's unrecouped depreciation, if any, is not the early termination, but the terms of the lease agreement itself.

Finally, Plaintiffs contend that the charges produced by NMAC's early termination formula are so outrageously high that NMAC hesitated to apply the Paragraph 18 formula in their cases. Instead, NMAC demanded that Plaintiffs pay the accelerated sum of all future, unearned lease payments, undiscounted, even though NMAC got the cars back early. They claim that NMAC explained that its standard practice is to compute the early termination liability under the Paragraph 18 formula, compare it to the sum of all unearned lease payments due under the lease as if the lessees held the car to term, then assess the lesser of the two charges. They call NMAC's method of charging the early terminating lessee the total of remaining lease payments the "Alternative Charge" or "Alternative Formula."[7] However Plaintiffs claim that

---

[7]We will adopt the term "Alternate Formula" in referring to this method here.

NMAC is not entitled to the accelerated sum of the remaining lease payments and it is therefore not relevant that the arbitrarily chosen Alternative Formula is less than the charge under the Paragraph 18 formula.

## II. DISTRICT COURT PROCEEDINGS

Plaintiffs filed a complaint and an amended complaint as a class action, with the parties agreeing to determine liability before class certification. The essence of the amended complaint is that NMAC violated the CLA by making the residual value one component of the equation by which early termination liability is calculated under the Paragraph 18 formula. They claim that the formula thereby shifts to early terminating lessees, the risk that the residual value in the lease is overstated. They allege that the risk is ordinarily borne by NMAC under what purport to be "closed end leases." The amended complaint alleged that this risk shifting is unreasonable because it bears no relationship to the harm that NMAC incurs as a result of early termination. The amended complaint also alleged that the inflated residual values used for lowering lessees' monthly lease payments also violate the CLA.

More particularly, Count I is a disclosure claim alleging that the Paragraph 18 formula violates the disclosure requirements of the CLA, 15 U.S.C. § 1667a and Federal Reserve Regulation M, 12 C.F.R. § 213. The Count I disclosure claim is referred to as an *Applebaum* claim, which is a CLA disclosure claim brought under 15 U.S.C.

§ 1667b(a) named after our decision in *Applebaum v. Nissan Motor Acceptance Corp.*, 226 F.3d 214 (3d Cir. 2000). Count II alleges substantive violations of the CLA, 15 U.S.C. § 1667b(b), and Regulation M. Count III is a common-law unjust enrichment claim against NMAC. Count IV seeks declaratory and injunctive relief. Count V seeks damages, both actual and treble, pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. ANN. § 201-1 *et seq*. Count VI seeks damages pursuant to Article 2A of the Uniform Commercial Code, alleging that the early termination formula is a provision for liquidated damages that is unreasonable as written.

Following discovery, the district court granted summary judgment to NMAC on a portion of Count II. The court found that the method of determining early termination charges by charging Plaintiffs the remaining lease payments was reasonable and, therefore, did not violate the substantive provisions of the CLA, i.e., 15 U.S.C. § 1667b(b). However, the district court also held that the Paragraph 18 early termination formula was unreasonable under CLA § 1667b(b). Accordingly, the district court granted summary judgment on that portion of Count II to Plaintiffs and awarded them statutory (as opposed to actual) damages of $100. The district court also entered summary judgment in favor of Plaintiffs on Count I, the § 1667a disclosure claim, and on Count IV. It then suspended adjudication of Counts III, V and VI, the state law claims, and granted Rule 54(b)

certification as to claims brought in Counts I and II, the federal CLA claims. *Miller v. Nissan Motor Acceptance Corp.*, No. Civ.A. 99-4953, 2000 WL 1599244 (E.D.Pa. Oct. 27, 2000).

Cross-appeals followed. However, in a Bench Opinion, issued on September 24, 2001, we dismissed the appeals for lack of appellate jurisdiction after holding that the district court improvidently granted Rule 54(b) certification. We reached that conclusion because the federal claims certified by the district court were inextricably intertwined with the Count I disclosure claim which had not been completely adjudicated. *Miller v. Nissan Motor Acceptance Corp.*, Nos. 01-1038/1114 (3d Cir. Sept. 24, 2001).

Thereafter, the district court fully adjudicated the Count I *Applebaum* disclosure claim in favor of Plaintiffs and once again granted Rule 54(b) certification on the CLA claims. Both NMAC and the Plaintiffs have filed appeals from that ruling.

## III. THE CONSUMER LEASING ACT

"In 1976, in response to an emerging trend toward automobile leasing, Congress passed the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667e, as Chapter 5 of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1607 *et seq.*" *Applebaum*, 226 F.3d at 217.

> The CLA was intended 'to assure a meaningful disclosure of the terms of leases of personal property for personal, family, or household purposes so as to

enable the lessee to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements.

*Id*. at 217-18 (quoting 15 U.S.C. § 1601(b)). "The Senate Report accompanying the CLA explained that '[t]he purpose of the legislation is to provide consumers with meaningful information about the component and aggregate costs of consumer leases, so they can make better informed choices between leases, and between leases and credit sales.'" *Id*. at 218 (citation omitted).

"The Federal Reserve Board has been given the authority to issue rules implementing the CLA, *see* 15 U.S.C. § 1604, and the Board has exercised that authority by promulgating 'Regulation M,' 12 C.F.R. § 213 *et seq.*" *Id*. "The Board's staff has also issued official commentary regarding these provisions." *Id*. "In *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980), the Supreme Court instructed that the Board's interpretation of the TILA and Regulation M should be accepted so long as they are 'not irrational.'" *Id*.

The CLA contains a section captioned "Consumer lease disclosures" that provides, in pertinent part, as follows:

> Each lessor shall give a

8

lessee prior to the consummation of the lease a dated written statement on which the lessor and the lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised value at the termination of the lease, if the lessee has such liability;

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination.

15 U.S.C. § 1667a(4) and (11). The CLA also contains a section captioned "Lessee's liability on expiration or termination of lease" which provides, in pertinent part, as follows:

Penalties or other charges for delinquency, default or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

15 U.S.C. § 1667b(b).[8]

Regulation M, which was in effect

---

[8]The section of the CLA immediately preceding § 1667b(b) concerns a lessee's liability upon the expiration of an open-end lease, i.e., one where the lessee's liability upon expiration is based on the difference between residual and realized value. In such a lease, § 1667b(a) explicitly provides that "[t]here shall be a rebuttable presumption that the estimated residual value is *unreasonable* to the extent that the estimated residual value exceeds the actual residual value by more than three times the average payment allocable to a monthly period under the lease." (emphasis added).

9

at the time of the Plaintiffs' leases,[9] required that lessors' disclosures "be made clearly, conspicuously, in meaningful sequence, and in accordance with the further requirements of this section." 12 C.F.R. § 213.4(a)(1). The Official Staff Commentary for this provision explained that "clearly, conspicuously, and in meaningful sequence" required "that the disclosures be in a reasonably understandable form." 12 C.F.R. Pt. 213, ¶ 4(a)(1). The Commentary stated, "while the regulation requires no particular mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other." *Id.* Regulation M mandated that various disclosures be made with respect to lease provisions imposing an early termination penalty including: (1) "[a] statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term and the amount or method of determining the amount of any penalty or other charge for early termination, 12 C.F.R. § 213(g)(12), and (2) "[a] statement that the lessee shall be liable for the difference between the estimated value of the property and its realized value at early

---

[9]Regulation M was revised in 1996. *Applebaum*, 226 F.3d at 218 n.3. Although the revisions became effective on October 31, 1996, compliance was optional until October 1, 1997. *Id.* The leases at issue here were entered into in 1996. All parties agree that the pre-revision 1995 Regulation M is applicable.

termination or end of the lease term, if such liability exists," 12 C.F.R. § 213(g)(13).

## IV. DISCUSSION

As noted, both sides to this dispute have appealed the district court's adjudication of the CLA claims. Briefly stated, the parties' arguments are as follows: NMAC argues (1) that the district court's grant of summary judgment on the CLA § 1667a disclosure claim (the *Applebaum* claim) was error; (2) that Plaintiffs do not have standing to challenge the Paragraph 18 formula; (3) but if they do have standing, that the district court erred in ruling that the Paragraph 18 formula for early termination is unreasonable and violates the CLA § 1667b(b).

Plaintiffs argue that the district court erred in finding that the formula NMAC actually applied on early termination, i.e., making them pay the remaining lease payments due on their respective leases (referred to by NMAC as their "Unsatisfied Contract Obligations"),[10] was reasonable and consistent with the CLA § 1667b(b). Each argument is discussed separately below.

### A. The § 1667a disclosure claims.

Count I of Plaintiffs' amended complaint asserted three disclosure claims. Plaintiffs claim (1) that the "Alternative Formula" NMAC charged for terminating

---

[10]As recited earlier, Plaintiffs refer to charges they actually paid as the "Alternative Formula."

10

early, i.e., having them pay the sum of the remaining monthly payments on their respective leases, should have been disclosed in their leases; (2) that the amount of the residual value should have been disclosed; and (3) that the fact that under the Paragraph 18 formula, an early terminating lessee would be responsible for the difference between residual and realized value should have been disclosed.

The district court granted summary judgment in favor of the Plaintiffs on each component of their disclosure claims.[11]

### 1. The "Alternative Formula" claim.[12]

The district court found that NMAC violated § 1667a and Regulation M because it used a different early termination formula than disclosed under the lease. NMAC argues that was error because it claims that the amount that was actually charged was readily ascertainable from what was disclosed.

CLA § 1667a(11) requires that a lessor provide a lessee with a statement setting forth, *inter alia*, "the amount or method of determining any penalty or other charge for . . . early termination." 15 U.S.C. § 1667a(11). NMAC submits that the Alternative Formula was disclosed in the lease. It argues that, at the inception of Plaintiffs' leases, in return for Plaintiffs' use of the leased cars, NMAC was entitled

to either (1) the full contract price, disclosed as the Total of Monthly Payments, or (2) if lessee terminated early, the monthly payments paid at time of termination, plus an early termination charge calculated under the Paragraph 18 formula. But, says NMAC, where the monthly lease payments made prior to early termination, combined with the Paragraph 18 formula early termination charge would be greater than the disclosed Total of Monthly Payments, the use of the early termination charge would result in NMAC receiving more than the leases' total contract obligation as measured by the Total of Monthly payments. Therefore, says NMAC, when it relied instead on the Alternative Formula, it only received a sum equal to the Total of Monthly Payments, which does not violate either the CLA or Regulation M.

However, given NMAC's disclosure obligation under the CLA, its defense of this practice amounts to nonsense. The issue is not whether the Alternative Formula produced an early termination charge that was reasonable under § 1667b(b), but whether it was disclosed in the lease. Clearly, it was not. Nothing in the lease suggests that there are two different methods by which NMAC can determine an early termination charge. On the contrary, the lease provides that early termination charges are to be determined only in accordance with the Paragraph 18 formula. Therefore, we agree that NMAC violated § 1667a(11). *See Channell v. CitiCorp Nat'l Servs., Inc.*, 89 F.3d 379 (7th Cir. 1996).

In *Channell*, the lessor disclosed in

---

[11]Our standard of review on an appeal from the entry of summary judgment is plenary. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991).

[12]Referred to by NMAC as the "Unsatisfied Contract Obligation."

its car lease that its early termination formula used the "Rule of 78s" to compute the amount of unearned interest to be credited upon early termination of a consumer lease. However, instead the lessor used the actuarial method. *Id.* at 383. The court of appeals held that this violated the CLA even though the undisclosed method benefitted the lessee. *Id*. Similarly, in *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434 (7th Cir. 1994), the lessee brought a disclosure claim against the lessor for omitting from its disclosed early termination formula certain elements that were used to reduce the amount of the early termination formula. *Id.* at 438. The court of appeals ruled that the lessor's failure "to disclose any portion of the formula that a lessor actually used for calculating the early termination charge, will give rise to a technical violation of the disclosure provision found in 15 U.S.C. § 1667a(11) and Regulation M." *Id.* at 439.

### 2. The residual value (*Applebaum*) claim.

In *Applebaum*, we held that the "requirement to disclose in a 'clear and conspicuous manner' the method of determining the amount of an early termination charge [under the CLA and Regulation M] includes the obligation to disclose the value of a variable, *such as residual value*, that is used in calculating the charge." 226 F.3d at 223 (emphasis added). It is undisputed that Plaintiffs' leases did not disclose the residual value of their leased vehicles. Consequently, the district court found that NMAC's leases violated the CLA.

NMAC argues that *Applebaum* was wrongly decided because the model forms promulgated by the Federal Reserve Board at the time the leases were entered into did not require disclosure of the residual value. However, *Applebaum* is binding on this panel and controls.[13] Accordingly, we hold that NMAC violated § 1667a by not disclosing the residual value of Plaintiffs' leased cars.

### 3. The differential claim.

In their amended complaint, Plaintiffs alleged that NMAC violated § 1667a(4) because NMCA did not disclose that they, as lessees, would be liable for the difference between the residual and realized values under the early termination formula. Section 1667a(4) requires "clear and conspicuous" disclosure, *inter alia*, of the fact "that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its actual appraised value at the termination of the lease, if the lessee has such liability." 15 U.S.C. § 1667a(4). The district court found that the "anticipated fair market value of the leased property . . . at the time of termination" is the residual value and that the "fact of the liability for the differential is disclosed." 2000 WL 1599244 at *14-15. However, the district court also found that NMAC must disclose the residual value at the inception of the lease.

This holding is nothing more than

---

[13]*See*, IOP 9.1; *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co..*, 46 F.3d 258, 266 n.6 (3d Cir. 1995).

12

the logical extension of its analysis of the residual value claim, viz., that *Applebaum* requires disclosure of the residual value. In any event, NMAC argues, as it did on the residual value claim, that the district court's holding on the differential value claim was error because *Applebaum* was wrongly decided. However, as noted, *Applebaum* is binding, and we therefore reject NMAC's argument.

We thus affirm the district court's grant of summary judgment to Plaintiffs on Count I.

**B. The § 1667b(b) reasonableness claims.**

**1. Standing to Challenge the Paragraph 18 Formula.**

In Count II of their amended complaint, Plaintiffs alleged, *inter alia*, that the Paragraph 18 formula violated the reasonableness requirements of § 1667b(b).[14] NMAC argued in the district

---

[14]As noted earlier, § 1667b(b) provides:

Penalties or other charges for delinquency, default or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

court that Plaintiffs did not have standing to challenge the Paragraph 18 formula for early termination because the formula was not applied to them. As noted, they were charged only the sum of the remaining payments under their respective leases.

The district court rejected NMAC's standing argument. It held:

It is certainly true that neither Miller nor the Roses paid an early termination charge that was directly calculated using the Paragraph 18 formula. However, we cannot ignore the fact that the amount that the Roses and Miller paid did result indirectly from the Paragraph 18 calculation. The undisputed evidence shows that NMAC decided what to charge early terminating lessees, including Miller and the Roses, by calculating *both* the sum of the remaining payments charge *and* the Paragraph 18 formula, and then selecting the lesser of these actually to levy upon the lessee. Thus, while the dollar figure Miller and the Roses paid was not arrived

---

15 U.S.C. § 1667b(b).

13

at using Paragraph 18, the amount *derived* from the Paragraph 18 calculation nevertheless helped to determine what they in fact paid. If the Paragraph 18 formula had resulted in a number lower than the sum of the remaining payments, then the Paragraph 18 formula amount would have been levied on them.

We therefore find that NMAC's position that the Paragraph 18 formula was not used to calculate the Roses' and Miller's liability is without merit. Thus, to the extent that the Paragraph 18 formula was unreasonable under the CLA, [Miller and the Roses] suffered injury thereby and have standing to pursue their claim.[15]

---

[15]This court exercises "plenary review of standing . . . issues, but review[s] for clear error the factual elements underlying the district court's determination of standing." *General Instrument Corp. v. Nu-Tek Electronics & Mfg., Inc.*, 197 F.3d 83, 86 (3d Cir. 1999).

2000 WL 1599244 at *23 (emphasis in original). After holding that Miller and the Roses had standing, the district court held that the Paragraph 18 formula for early termination was unreasonable under § 1667b(b). Not unexpectedly, in its appeal, NMAC renews its argument that the Plaintiffs do not have standing to challenge the Paragraph 18 formula because it was not applied to them when they terminated their leases.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 484 (3d Cir. 1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Standing 'subsumes a blend of constitutional requirements and prudential considerations.'" *Id.* (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)). "Obviously, satisfying the Article III 'case or controversy' requirement is the 'irreducible constitutional minimum' of standing." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Article III constitutional standing contains three elements: (1) the Plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection

14

between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant and not the result of independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 484-85 (citing *Lujan*, at 560-61).

"In addition to the 'immutable requirements of Article III,' the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing."[16]  *Id*. at 485 (quoting *Bennett v. Spear*, 520 U.S. 154 (1997)).  These principles are:

(1) the Plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2)

even when the Plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and (3) the Plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Id*. (quoting *Valley Forge Christian College*, 454 U.S. at 474-75) (internal quotation marks omitted).

In light of these general principles, we agree that the claim that the Plaintiffs lack standing to challenge the Paragraph 18 formula has considerable force.  They never paid the early termination charge pursuant to the Paragraph 18 formula.  Therefore, they were not harmed by it, even assuming it is unreasonable and violates § 1667b(b).  They nevertheless suffered no "injury in fact" because of it.

Although there is a paucity of case law on the issue of standing in this context, two cases support NMAC's position, viz., *Kedziora v. Citicorp Nat'l Servs., Inc.*, 780 F.Supp. 516 (N.D.Ill. 1991), *aff'd sub nom. in relevant part, Channell v. Citicorp Nat'l. Servs., Inc.*, 89 F.3d 379 (7th Cir. 1996), and *Highsmith v. Chrysler Credit*

---

[16]Article III constitutional standing is a threshold issue that must be addressed before considering issues of prudential standing.  *Joint Stock Society v. UDV North America, Inc.*, 266 F.3d 164, 175 (3d Cir. 2001).

*Corp.*, 18 F.3d 434 (7th Cir. 1994). In *Kedziora*, the lessees defaulted on their 60-month car lease after 22 months and thereby incurred a substantial termination charge. However, they attempted to challenge the reasonableness of an early termination formula applicable to defaults within the first 12 months of the lease under § 1667b(b). The district court held that the lessees lacked standing to challenge the formula applicable within the first 12 months because it "caused him or her no actual injury because it never became applicable to him or her." 780 F.Supp. at 523. In *Highsmith*, the court of appeals held that a lessee who had not terminated his lease, or even alleged that he intended to terminate his lease, had no standing to challenge the reasonableness of an early termination provision in his car lease because "the early termination clause has not been applied to him and he has suffered no harm from it." 18 F.3d at 437. Both of these cases, although not on all fours with Plaintiffs' suit, lend support to NMAC's argument.

Plaintiffs initial standing argument is that, because their leases contained the Paragraph 18 formula, they were bound by it and therefore they have standing to challenge it. They cite *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989), which they say stands for the proposition that "[a] contracting party has standing to challenge the reasonableness of a clause which, by its terms, applies to him as enforcement *vel non* may cause him economic harm." Miller/Roses' Br. as Appellees, at 17. However, we do not believe that *County of Oakland* stands for

that proposition. *County of Oakland* was an antitrust case and the standing issue discussed therein centered on the contours of the *Illinois Brick* doctrine.[17] Quite simply, the question raised in *County of Oakland* – whether an intermediate user who pays illegal antitrust overcharges that are passed along to end users has antitrust standing – has nothing to do with the issue

---

[17]In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-731 (1977), the Court held that persons who are not direct purchasers from the defendant antitrust violator cannot maintain an antitrust action. In *Illinois Brick*, it was alleged that concrete block manufacturers had engaged in a conspiracy to fix the price of concrete block. The concrete block manufacturers sold the concrete block to masonry contractors who, in turn, sold the concrete block to general contractors, who used the concrete block to build masonry structures which were incorporated into buildings which the general contractors sold to the State of Illinois. The Court held that the State of Illinois could not bring an antitrust action against the concrete block manufacturers whose product was incorporated into the buildings it bought. That holding is based largely upon the difficulty of establishing the extent to which an indirect purchaser was actually injured by the underlying antitrust violation and the difficulty inherent in prorating the fixed-price overcharge among the number of entities in the chain of manufacture and distribution. 431 U.S. at 732-733.

of whether a lessee who pays an early termination charge has standing to challenge a formula for calculating an early termination fee that was never applied to him/her.

Plaintiffs also look to two other cases to support their standing. However, neither case supports their argument. In *Lundquist v. Security Pacific Automotive Financial Servs. Corp.*, 1992 WL 475651 (D.Conn. June 9, 1992), *aff'd* 993 F.2d 11 (2d Cir. 1993), the lessee filed a class action challenging, *inter alia*, the reasonableness of an early termination provision in an automobile lease. The lessor moved to dismiss the § 1667b(b) reasonableness challenge under Rule 12(b)(6), arguing that because the lease had not been terminated, the lessee lacked standing because she had not suffered any injury. A magistrate judge held that the lessee did have standing because

> [t]he Plaintiff is a party to the lease and bound by its terms. If the Plaintiff decides to default on the lease, she will be subject to the early termination charges. There is an immediate threat of injury to her because if she returns the car she would be subject to those allegedly unreasonable charges.

1992 WL 475651 at *6. A district court judge adopted the magistrate judge's reasoning. However, the court of appeals did not discuss the standing issue on appeal. Rather, it affirmed both the denial of class certification and a finding that the early termination provision violated the disclosure requirements of the CLA. Therefore, the magistrate judge's standing discussion does not have much force. In fact, we believe that it is plainly wrong. Article III constitutional standing requires that an injury in fact must be "actual or imminent, not conjectural or speculative." *Trump Hotels*, 140 F.3d at 484 (citation omitted). The magistrate judge's discussion in *Lundquist* is purely speculative. The magistrate judge reasoned that: *if* the lessee decides to default and *if* she returns the car, she *would* be liable for the early termination charges. Damage was, therefore, neither actual nor imminent.

The second case Plaintiffs rely upon is *Johnson v. Steven Sims Subaru, Inc.*, U.S. Dist. Lexis 11694 (N.D.Ill. 1993). Plaintiffs claim that *Johnson* holds that a lessee has standing to challenge early termination provisions in his/her auto lease before suffering adverse consequences. *Johnson* does, in fact, say that. 1993 U.S.Dist.Lexis 11694, at *5-11. The lessee in *Johnson*, like the lessee in *Lundquist*, had not terminated the lease. However, the lessee in *Johnson* had written a letter to the lessor saying that she wanted to terminate early but could not afford the early termination charges. A magistrate judge found that the lessee had standing because if the lessee actually terminated her lease she would become liable for the early termination charges.

However, we believe that *Johnson*'s standing analysis is just as speculative as *Lundquist*'s. We fail to see

17

any Article III injury-in-fact based solely on a lessee saying that she prefers to terminate a lease and then refraining from doing so.[18] Moreover, *Johnson* is a magistrate judge's Report and Recommendation, which, as NMAC is quick to point out, a district court judge in the district where *Johnson* was decided, has noted was never adopted by the district court. The suit was settled before the district court ruled on objections that were filed. NMAC's Reply Br. at 26-27 (quoting *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1415 n.14 (N.D.Ill. 1996).

Plaintiffs make a number of additional arguments which they claim demonstrate their standing to challenge the Paragraph 18 formula. First, they argue that they have standing to challenge the Paragraph 18 formula because the formula was used as a "benchmark" in determining whether the early termination charges actually paid were reasonable. And, argue Plaintiffs, if the Paragraph 18 formula was used as a "benchmark" to determine

---

[18]Our fairly narrow view of the standing issue here is confined to the specific context of consumer car leases. Issues of standing can arise in so many varied settings that we think it appropriate to caution that our analysis ought not be automatically extended to other situations where the possibility of injury may be sufficiently real to support standing, both in the Article III context and the prudential sense, even though no actual injury has yet been inflicted.

whether the charges they actually paid were reasonable, "the district court necessarily had to consider whether the lease formula itself violated the CLA by residual-risk shifting or otherwise." Miller/Roses Br. as Appellees, at 18. Therefore, conclude the Plaintiffs, the Paragraph 18 formula was applied to them because NMAC charged them the balance of lease payments due under the lease only after comparing the Paragraph 18 formula to the balance of lease payments due. Consequently, they contend that they have standing to challenge the reasonableness of the Paragraph 18 formula.

We disagree. We do not believe that the district court necessarily considered whether the Paragraph 18 formula violated the CLA in determining whether the charges they actually paid for early termination were reasonable. The district court merely noted that, because NMAC compared the charges under the Paragraph 18 formula to the charges under the remaining payments method, the charges Plaintiffs actually paid resulted indirectly from the Paragraph 18 formula. That is not the same as holding that the Paragraph 18 formula actually violates the CLA.

Moreover, the fact that NMAC compared the charges under the Paragraph 18 formula to the charges under the remaining payments methods does not mean that the Paragraph 18 formula was indirectly applied to the Plaintiffs. On the contrary, the fact that NMAC chose not to charge Plaintiffs an early termination fee based on the Paragraph 18 formula actually shows that the Paragraph 18 was

*not* applied to Plaintiffs.

Second, Plaintiffs argue that they have standing to challenge the Paragraph 18 formula because they alleged and produced evidence that if they had received an honest residual value, instead of NMAC's inflated one, the Paragraph 18 formula would have yielded a figure lower than the charge they paid under the remaining payments method, i.e., the so-called Alternative Formula charge. They claim that the district court found that had NMAC used an accepted industry standard for the residual, specifically something called the "Auto Lease Guide," the early termination charge under the Paragraph 18 formula would have been $300 less than the sum of the remaining payments under Miller's lease. They also claim that the district court found that had NMAC used the "revenue-neutral residual" for the Roses, the Paragraph 18 formula would have been $438.79, rather than the $480.00 remaining payments method they ultimately paid. Accordingly, Plaintiffs contend that they demonstrated harm from NMAC's use of both the Paragraph 18 formula and the remaining payments method, and therefore have standing to challenge the reasonableness of the Paragraph 18 formula under § 1667b(b).

These calculations do not prove standing. In the first place, Plaintiffs are being disingenuous in stating what the district court found. All that the district court did in its standing discussion is recite that Plaintiffs claimed that had NMAC used different residual values, the Paragraph 18 formula would have produced a lower termination charge than

the remaining payments method. 2000 WL 1599244 at *22. That along with allegations and averments by both parties allowed the district court to conclude that the Plaintiffs had standing because the amount charged under the remaining payments method indirectly resulted from the Paragraph 18 formula.

Moreover, an allegation that the Paragraph 18 formula would have generated a lower termination charge than the remaining payments if NMAC had used an accurate residual value method does not prove standing. As recited above, the fact that NMAC used the remaining payments method because it was lower than the Paragraph 18 formula shows that the Paragraph 18 formula was not applied to them and, therefore, they have no standing. As noted above, injury can not be conjectural. Essentially, Plaintiffs are relying upon a hypothetical to manufacture standing. We will not now speculate about the amount of early termination charges that would have been produced using different residual values.

Third, Plaintiffs argue that they have standing because, in March 1999, Miller obtained a phone quote from NMAC of over $3,000 for the cost of terminating his lease about 9 months early. Miller claims that the district court found that after receiving the $3,000 early termination quote, he decided not to terminate until November 1999. However, the district court never made any such finding. The district court merely recited that Miller made a phone call to obtain an early termination quotation. 2000 WL 1599244 at *2. In any event, Miller

19

never explains how a lessee has standing to challenge an early termination fee simply because he/she obtains a quotation of the early termination fee. *See Highsmith*, 18 F.3d at 437 (suggesting that Plaintiff must at least allege that he intends to terminate his lease in order to obtain standing).

Fourth, and finally, Plaintiffs suggest that because they have standing to assert disclosure claims under § 1667a of the CLA, they have standing to assert substantive claims under § 1667b of the CLA. However, standing to assert § 1667a disclosure claims does not establish the injury required to assert substantive claims under § 1667b. A Plaintiff may have standing to challenge certain practices, but not others. *See Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 561 (3d Cir. 2002).

## 2. Reasonableness of the Alternative Formula Charge.

The Alternative Formula charges that NMAC assessed were the two remaining months lease payments in the case of the Roses and the one month payment remaining in the case of Miller. The district court found that these "early termination charges" were reasonable under § 1667b(b). 2000 WL 1599244 at *31-32. In their cross-appeal, Plaintiffs argue that was error.

They first argue that the district court erred by analyzing the Alternative Formula under the § 1667b(b) reasonableness standard because the Alternative Formula was not disclosed in the lease. In Plaintiffs' view, the Alternative Formula charges were not early termination charges at all, but were extra contractual charges imposed by NMAC. Therefore, because they were imposed extra-contractually, they contend that the district court should have analyzed the Alternative Formula charges under basic contract law and the Uniform Commercial Code ("UCC").

However, this argument is conceptually flawed from the outset. The claims that are the subject of these Rule 54(b) appeals are the Plaintiffs' federal claims that NMAC's leases violated the CLA. Because Plaintiffs challenged the Alternative Formula charges under the CLA, we fail to see the relevance of state contract law and/or the UCC, and Plaintiffs have offered no authority to convince us their reliance on state law is proper. Indeed, if taken to its logical conclusion, their argument suggests that their Alternative Formula claim is really a state law claim and not a federal law claim at all. In addition, Plaintiffs appear to be trying to force the non-disclosure of the Alternative Formula under § 1667a(11) into a substantive violation under § 1667b(b) using the wedge of contract law.

In any event, Plaintiffs argue that if the district court had analyzed the Alternative Formula charges under UCC and/or contract law damages standards, they should have been granted summary judgment. They argue that, under those standards, it was NMAC's burden to offer proof it was damaged by their early lease terminations and the surrender of their vehicles before the leases had expired. In their view, the Alternative Formula charge was a liquidated damages formula and,

therefore, the party seeking to enforce the liquidated damages has the burden of establishing the reasonableness of the formula. *See Finkle v. Gulf & Western Mfg. Co.*, 744 F.2d 1015, 1021 (3d Cir. 1984). However, since NMAC offered no proof of harm, Plaintiffs claim NMAC did not establish the reasonableness of the liquidated damages.

Moreover, their claim that NMAC offered no proof of harm is incorrect. The district court expressly found that "NMAC's harm. . . is the loss of the remaining monthly payments *and* the car is returned for disposition sooner than NMAC expected, thereby resulting in earlier than expected disposition costs and risks." 2000 WL 1599244 at *32 (emphasis in original). The district court found that the Alternative Formula charge was reasonable "in light of" that actual harm. *Id.* Plaintiffs do not bother to mention the district court's finding that NMAC suffered this harm.

NMAC counters by arguing that it was not its burden to prove that the Alternative Formula charges were reasonable. NMAC claims it was Plaintiffs' burden to prove that the charges were unreasonable under § 1667b(b) standards. *See Kedziora*, 780 F.Supp. at 535 n.12 (Plaintiffs who seek to avoid enforcement of lease term bear burden of proof). Plaintiffs respond by arguing that even if it is their burden to demonstrate unreasonableness, they have done so. They contend that even though they turned their cars in prior to the expiration of their leases, NMAC is not entitled to charge them anything, because a lessor cannot both recover the leased property and accelerate the remaining monthly payments under the lease. Rather, a lessor must chose between those two remedies. In support of that proposition, they cite to *Finkle*, 744 F.2d at 1021-1022. *Finkle* does say that a lessor cannot both recover the leased property and accelerate the monthly payments. However, *Finkle* concerned a commercial property lease and refers to a principle applicable to commercial property leases in Pennsylvania. Moreover, *Finkle* concerned non-renewal options under a lease for a commercial property. Depreciation is not a factor in that context. However, depreciation is a driving factor under vehicle leases such as the ones before us here.

Finally, Plaintiffs argue that even if the district court was correct that the Alternative Formula charge was reasonable under § 1667b(b), the charges should have been discounted to present value. According to Plaintiffs, without discounting the Alternative Charge to present value, NMAC would be recovering interest on sums that had already been repaid, putting NMAC in a better position than if the lease had been fully performed. In the abstract, Plaintiffs are correct. Absent discounting, NMAC is receiving unearned interest or rents. However, the district court properly addressed this argument in its opinion:

> The Roses terminated their lease two months early, and Miller only one month early, and the discounting of the monthly payments would

logically be done at the rate implicit in the lease, pursuant to Paragraph 18. The rate implicit in the Rose lease was 5.99%, and the rate implicit in the Miller lease was 7.6%. Thus, just as NMAC's representative Robin Norris testified, the gain to NMAC resulting from its practice of not discounting was "a couple of bucks" as to the Rose and Miller leases. This slight overage is *de minimis* and not enough, in the cases of Miller and the Roses, to render the early termination charge unreasonable in light of the harms to NMAC arising from the early termination pursuant to § 1667b(b).

2000 WL 1599244 at *32. NMAC claims that it gained only a "couple of bucks" as a result of not discounting because the Plaintiffs' remaining payments consisted almost entirely of the depreciation that had not yet been paid. It was the interest or rent charge component that amounted only to a "couple of bucks."

Plaintiffs do not dispute this. Consequently, we agree with the district court's conclusion that the *de minimis* overage resulting from NMAC's failure to discount to present value does not make the Alternative Formula Charge unreasonable under § 1667b(b).

## V. CONCLUSION

For all of the above reasons, we will affirm the district court's grant of summary judgment to Plaintiffs on their Count I disclosure claims and on Count IV. We will also affirm the grant of summary judgment to NMAC on the reasonableness of the Alternative Formula component of Count II. However, we will reverse and vacate the grant of summary judgment to Plaintiffs on the reasonableness of the Paragraph 18 early termination formula component of Count II for lack of standing.

22